UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| ELIZABETH KUHN, *et al.*, | ) | |
|---|---|---|
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:06-CV-317 CAN |
| | ) | |
| LAPORTE COUNTY | ) | |
| COMPREHENSIVE MENTAL | ) | |
| HEALTH COUNCIL, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

On May 16, 2006, the Plaintiffs, Elizabeth Kuhn and Robert Hipps, ("Kuhn and Hipps") filed a complaint alleging that they were illegally terminated from their employment. Specifically, they alleged that they are "whistleblowers" and were impermissibly terminated for engaging in statutorily protected activity. The Defendant, LaPorte County Comprehensive Mental Health Council, ("Swanson Center") disagreed and alleged that Kuhn and Hipps were terminated for other permissible reasons. Swanson Center has now filed a motion for summary judgment. For the reasons below, this Court concludes that summary judgment is not appropriate as there are material facts in dispute which must be resolved by a jury.

**I.   FACTS**

The facts, as presented, are either undisputed or are viewed in the light most favorable to Plaintiffs Kuhn and Hipps. Swanson Center is a non-profit, mental health center that receives Medicaid reimbursement from the U.S. Department of Health and Human Services ("DHHS") and the Indiana Family and Social Services Administration ("FSSA") for services provided. On January 19, 2004, Plaintiff Kuhn entered into a three-year employment contract to serve as

Swanson Center's Chief Executive Officer and Executive Director. On October 10, 2005, Swanson Center hired Plaintiff Hipps, under a one-year contract, to perform an extensive review of Swanson Center's medical records.

On March 8, 2006, Kuhn was notified by the DHHS, Office of the Inspector General ("OIG"), that Swanson Center was being audited for its Medicaid billing. Hipps, having previously discovered numerous documentation problems during his internal audit, was concerned that Swanson Center's "audit team" might supply Kuhn with altered medical records and, accordingly, provided Kuhn with copies of the original medical records.

On March 16, 2006, upon receiving documents from Swanson Center's "audit team", Kuhn and Hipps discovered numerous discrepancies, including: substantive changes to progress notes, corrections made to billing codes, and the forged signature of a former employee. That evening, Kuhn and Hipps, along with several other Swanson Center employees, searched the recycle bins for evidence of document alterations and discovered the original progress note, drafts of the altered note, and "practice" signatures of a former Swanson Center employee.

On March 17, 2006, without notifying Swanson Center's Board President, Shaw Friedman, or Swanson Center's Medical Director, Dr. Kumund Aggarwal, Kuhn sought outside legal counsel. Kuhn's legal counsel advised her not to inform Swanson Center's Board regarding her investigation until it was complete. On March 30, 2006, upon the advice of her counsel, Kuhn voluntarily disclosed the altered documents to the United States Attorney's office to protect Swanson Center from federal prosecution.

On March 31, 2006, Kuhn and Swanson Center's HR Director, Scott Pelath, interviewed Swanson Center employees suspected of altering the documents, two of the employees admitted

their involvement. Pelath suspended all three employees pending the conclusion of the investigation. Immediately thereafter, Dr. Aggarwal, Friedman, and Swanson Center's legal counsel, Sam Melnick, were informed of the investigation and subsequent suspensions.

On April 3, 2006, Friedman met with Kuhn to discuss the details of her investigation. Kuhn informed Friedman that she had reported her investigation and evidence of fraud to outside counsel and to the U.S. Attorney's office because she was concerned for Swanson Center's liability. Friedman told Kuhn that she had failed to follow internal procedures, and terminated her employment. At the time of her termination, Kuhn had nearly nine months remaining on her employment contract.

On April 11, 2006, Hipps approached Pelath and expressed concern over the progress of the investigation and indicated that he planned on reporting the matter. The next day, Pelath gave Hipps his two weeks notice of employment termination although Hipps had nearly six months remaining on his one-year employment contract.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Lawson v. CSX Transp., Inc., 245 F.3d 916, 922 (7th Cir. 2001). In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the nonmoving party as well to draw all reasonable and justifiable inferences in favor of that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986);

3

King v. Preferred Technical Group, 166 F.3d 887, 890 (7th Cir. 1999). To overcome a motion for summary judgment, the non-moving party cannot rest on the mere allegations or denials contained in its pleadings. Rather, the non-moving party must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. Celotex v. Catrett, 477 U.S. 317, 322-23 (1986); Robin v. Espo Eng'g Corp., 200 F.3d 1081, 1088 (7th Cir. 2000). Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing Bank of Ariz. v. Cities Serv.s Co., 391 U.S. 253, 289 (1968)).

B.  False Claims Act

The False Claims Act ("FCA") imposes civil penalties on persons submitting "false or fraudulent claim[s] for payment or approval" to the United States government. 31 U.S.C. § 3729(a); see also generally 31 U.S.C. §§ 3729-3732 (2004). To aid enforcement, the FCA permits private persons ("relators") to bring *qui tam* actions on behalf of the government. Fanslow v. Chi. Mfg. Ctr., Inc., 384 F.3d 469, 479 (7th. Cir. 2004) (citing 31 U.S.C. § 3730(b)). In addition, Congress amended the FCA to provide "whistleblower" protection against employment retaliation, and permits plaintiffs to proceed on such claims independent of a *qui tam* action. See 31 U.S.C. § 3730(h); Fanslow, 384 F.3d at 479. Subsection (h) of the FCA statute provides in relevant part,

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

4

31 U.S.C. § 3730(h).

As Fanslow makes clear, to prove retaliation under § 3730(h), Plaintiffs must present evidence supporting each of the following elements: (1) that Plaintiffs' actions were taken "in furtherance of" an FCA enforcement action and were therefore protected by statute; (2) that Plaintiffs' employer, the Swanson Center, knew that Plaintiffs were engaged in such protected activity; and (3) that Plaintiffs' discharge was motivated, at least in part, by the protected activity.[1] Fanslow, 384 F.3d at 479; Brandon v. Anesthesia & Pain Mgmt. Assoc., Ltd., 277 F.3d 936, 944 (7th Cir. 2002).

1. Protected Activity

In order to obtain summary judgment in its favor, Defendant must show that Plaintiffs have failed to present sufficient facts to support a jury finding that they had engaged in protected conduct under the FCA. Fanslow, 384 F.3d at 479. The plain language of the FCA defines protected activity as "lawful acts done . . . in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed." 31 U.S.C. § 3730(h). The term "protected activity" has been interpreted broadly, and an employee need not have actual knowledge of the FCA for her actions to be considered "protected activity" under § 3730(h). Fanslow, 384 F.3d at 479. Instead, in the Seventh Circuit, the relevant inquiry to determine whether an employee's actions are protected under § 3730(h) is: "(1) Whether the employee in good faith believes, and (2) a reasonable employee in the same or

---

[1] In addition to their FCA claim, Plaintiffs allege that their discharge violated the whistleblower protection provision of the Indiana False Claims Act ("IFCA"). I.C. § 5-11-5.5-8. The Indiana False Claims Act mirrors the Federal FCA in all material respects, so the following analysis is equally applicable to the Plaintiffs' IFCA whistleblower claims.

5

similar circumstances might believe, that the employer is committing fraud against the government." Id. at 480.

Swanson Center argues that Kuhn and Hipps' actions were unprotected because they were unlawful. Specifically, Swanson Center argues that Kuhn and Hipps violated federal and state privacy laws by disclosing confidential patient records to an outside attorney as part of their investigation. However, Kuhn and Hipps note that HIPPA expressly provides and exemption for whistleblower disclosures to attorneys. See 45 C.F.R. § 164.502(j).

> Disclosures by whistleblowers. A covered entity is not considered to have violated the requirements of this subpart if a member of its workforce or a business associate discloses protected health information, provided that: (i) The workforce member or business associate believes in good faith that the covered entity has engaged in conduct that is unlawful or otherwise violates professional . . . (ii) The disclosure is to: . . (B) An attorney retained by or on behalf of the workforce member or business associate for the purpose of determining the legal options of the workforce member or business associate with regard to the conduct described in paragraph (j)(1)(i) of this section."

Id.; see also 64 Fed. Reg. 59,990 (Nov. 3, 1999). Further, Kuhn and Hipps point out that the Indiana privacy law at issue contains a provision allowing disclosures authorized by other statutes. See I.C. §16-39-5-3(k) ("This chapter does not do any of the following: (1) repeal, modify, or amend any statute requiring or authorizing the disclosure of information about any person . . ."). This Court finds Kuhn and Hipps interpretation of these statutes persuasive and, accordingly, determines that Kuhn and Hipps' disclosure of patient records to outside counsel was "lawful."

In addition, although the Swanson Center admits that Kuhn and Hipps had discovered that some employees had altered medical billing documents including forging signatures, creating false records and destroying original documents, Swanson Center argues that Kuhn and Hipps' conduct was not protected activity under the FCA because the altered documents were

6

never presented to the government. Essentially, Swanson Center argues that, because Kuhn and Hipps retained the altered documents, there was no fraud because no altered documents were submitted to the government in support of a claim for payment.

Swanson Center's argument is like the old puzzle; if a tree falls in the forest and there is no one to hear it, does it make a sound? Or, do altered, forged and destroyed documents, which are not presented to the government in support of a claim for payment constitute fraud? Fortunately, the Court does not need to resolve those questions as they are not material to either Kuhn and Hipps' claims or Swanson Center's motion for summary judgment.

In Fanslow, the Seventh Circuit Court made clear that the FCA protected employees from retaliation "while they are collecting information about possible fraud, before they have put all the pieces together." Fanslow, 384 F.3d at 481 (citing Neal v. Honeywell, 33 F.3d 860, 864 (7th Cir. 1994); U.S. ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 739 (D.C. Cir. 1998)). Accordingly, Kuhn and Hipps are not required to show that Swanson Center was subsequently liable for its actions in order to have been engaged in protected activity. Instead, Kuhn and Hipps are only required to show sufficient evidence to establish that their "investigatory conduct" was motivated by a good faith belief, consistent with that of a reasonable person in the same or similar circumstances, that Swanson Center was committing fraud against the government. Id. at 480-481.

Kuhn and Hipps submitted substantial evidence to support such a finding, which Swanson Center has done little to rebut. To begin, Kuhn and Hipps submitted evidence that Swanson Center had a history of problems with its Medicaid billing documentation. (Exhibit II). Indeed, Swanson Center does not contest that, prior to OIG's audit, Plaintiff Hipps was hired by the Swanson Center to perform an internal audit of Swanson Center's records. In addition, as

stated earlier, the facts are undisputed that medical billing documents, assembled pursuant to the government audit, were intentionally altered by Swanson Center employees. Finally, Kuhn and Hipps submitted further evidence suggesting that Kuhn and Hipps continued their investigation, sought outside legal counsel and obtained a private hearing with the U.S. Attorney's office precisely to protect the Swanson Center from perceived present and future legal liability.

Accordingly, while Swanson Center vigorously maintains that it committed no fraud, it misconstrues the FCA if it believes that Kuhn and Hipps' actions were not protected activity. And further, Kuhn and Hipps have presented sufficient evidence upon which a reasonably jury could conclude that they had a good faith belief that is objectively reasonable that Swanson Center was committing fraud against the government.

2. Notice

Additionally, to succeed at summary judgment, Defendant must show that Plaintiffs Kuhn and Hipps have failed to produce sufficient evidence to establish that their actions placed Swanson Center on notice of the distinct possibility of a *qui tam* action. Fanslow, 384 F.3d at 484; Brandon v. Anesthesia and Pain Mgmt. Assoc., Ltd., 277 F.3d. 936, 945 (7th Cir. 2002). In this Circuit, the scope of notice required depends upon whether the employee is normally engaged in identifying and reporting fraudulent activity. Fanslow, 384 F.3d at 484. Employees charged with discovering fraud in the normal course of their job duties are obligated to a heightened notice requirement, necessitating that the employee indicate an explicit intention to bring a *qui tam* action or otherwise report the fraudulent conduct to the government. Id. (citing Brandon, 277 F.3d at 945); see also U.S. ex. rel. Yesudian v. Howard Univ., 153 F.3d 731, 743 (D.C. Cir. 1998). Other employees are held to a lesser notice standard and are only required to show that their employer was aware of the employee's fraud investigation. Id.

Although Plaintiff Kuhn served as CEO of Swanson Center, Swanson Center does not argue nor present evidence that Kuhn was obligated in the normal course of her duties to discover fraud. Accordingly, Kuhn must show only that Swanson Center was aware of her fraud investigation. This fact is clearly established by Kuhn and Hipps' submission of depositions of Swanson Center employees with knowledge of the investigation and documented conversations between Kuhn and Swanson Center's Board President, Shaw Friedman, regarding the investigation's extent and scope. Indeed, while Swanson Center continues to argue that Kuhn and Hipps failed to investigate a viable FCA claim, Swanson Center does not dispute Kuhn and Hipps' evidence that several conversations regarding Kuhn and Hipps' fraud investigation took place between Kuhn and the Swanson Center.

In contrast, Hipps is held to the heightened notice requirement, given that Hipps was explicitly hired for the purpose of conducting an internal audit of Swanson Center's records. As such, Hipps fits the definition of a "fraud alert" employee. See Fanslow, 384 F.3d at 484; Brandon, 277 F.3d at 945. Even with this heightened standard, however, Hipps has submitted evidence, which the Swanson Center does not rebut, that Hipps indicated to Swanson Center's HR Director, Scott Pelath, shortly before he was terminated, that he intended to report Swanson Center's suspected fraudulent activities to the government. Uncontested evidence of such a communication by Hipps is sufficient for a reasonable juror to find that Hipps met the heightened standard of notice required for "fraud alert" employees. See Fanslow, 384 F.3d at 484 (discussing Brandon, 277 F.3d at 435).

Accordingly, given the facts submitted by Plaintiffs and the lack of rebuttal by the Defendant, a reasonable juror could find that the Swanson Center had knowledge that both Plaintiffs were engaged in protected conduct.

9

3. Retaliatory Motive

Finally, to be successful on summary judgment, Defendant must also demonstrate that Plaintiffs have not submitted sufficient facts to raise a material issue as to whether Plaintiffs' terminations were motivated, at least in part, by their protected conduct. Fanslow, 384 F.3d at 485 (citing Brandon, 277 F.3d at 944). Further, if the Plaintiff has succeeded in making this showing, Defendant must then demonstrate "that the same decision would have been made even if the employee had not engaged in protected activity." Id. (citing Yesudian, 153 F.3d at 736 n. 4).

In Fanslow, the Seventh Circuit placed heavy emphasis on the Plaintiff's evidence of positive evaluations, regular pay raises, and the close timing between the Plaintiff's notification of protected activity and the Plaintiff's termination, as evidence establishing improper motive for Plaintiff's termination. See Id. at 485-86. In this case, Kuhn and Hipps have submitted similar evidence to suggest that their termination was motivated, at least in part, on their protected conduct and that Swanson Center's arguments to the contrary are pretextual.

b. Kuhn's Termination

Swanson Center vigorously argues that Kuhn was discharged because she failed to follow internal operating procedures for reporting and investigating the fraud, including failure to notify the Board of Directors and Swanson Center's Medical Director, and consulting with and retaining outside legal counsel without board approval. However, Kuhn was terminated just three days after she notified Friedman of her investigation. As Fanslow shows, the timing of the termination creates an inference that Kuhn was terminated at least, in part, due to her protected activity.

Additionally, Kuhn submitted evidence suggesting that she had been a valued employee prior to reporting the investigation to Friedman. For instance, in previous performance evaluations, Friedman had accredited Kuhn with strong decision making and leadership skills and noted her skill in conflict resolution. Further, Friedman had credited Kuhn with leading the Center's financial turnaround and working hard to ensure the future growth of Swanson Center. And finally, Swanson Center's Board increased Kuhn's salary, from $75,000 to $90,000 in 2005, and to $102,500 in 2006. Kuhn's second raise was approved only one week before her termination.

As Fanslow instructs, the timing of Kuhn's termination coupled with her otherwise laudable work performance history are sufficient facts for a jury to reasonably determine that her termination was, at least in part, motivated by her protected activities.

      c.      Hipps Termination

Similarly, Hipps submitted evidence that his job duties were abruptly changed from auditing Swanson Center documents to training Swanson Center employees, shortly after Kuhn was terminated. Further, Hipps provided evidence that, soon thereafter, he told Swanson Center's HR Director, Scott Pelath, that he was disappointed with the slow progress of Swanson Center's fraud investigation and stated his intent to report the activities to the government. The next day, Swanson Center terminated Hipps' employment contract. Swanson Center now argues that Hipps was terminated because his contract was nearly concluded. However, Hipps submitted evidence that suggests he had nearly six months remaining on his one-year contract at the time he was fired. Again, the timing of the termination creates an inference that his termination was due, in part, to his protected activity. This Court must conclude that as to both

Plaintiffs, there exists issues of material fact as to the motivations for terminating their employment which are appropriately left for a jury to decide.

## IV. CONCLUSION

Because there are material facts in dispute which must be resolved by a jury, Swanson Center's motion for partial summary judgment must be and now is **DENIED** [Doc. No. 60], Plaintiffs' motion for hearing is also now **DENIED AS MOOT** [Doc. No. 68].

**SO ORDERED.**

Dated this 4th Day of September, 2008.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge
